IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| HENRY GARCIA, on behalf of himself and all others similarly situated,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>SONY COMPUTER ENTERTAINMENT AMERICA, LLC, and ACTIVISION BLIZZARD, INC.,<br><br>　　　　Defendants. | No. C 11-02246 RS<br><br>**ORDER GRANTING MOTION TO DISMISS WITHOUT LEAVE TO AMEND** |

## I. INTRODUCTION

Plaintiff Henry Garcia filed this putative class action against defendants Sony Computer Entertainment America, LLC, and Activision Blizzard, alleging that they are acting in concert to sell certain Activision videogames, including "Call of Duty: Modern Warfare 2" and "Call of Duty: Black Ops" (collectively "Call of Duty"), which cause older versions of the Sony Playstation 3 (PS3) videogame console to overheat during normal game play, rendering them permanently inoperable. According to the Second Amended Complaint (SAC), defendants misrepresented that these games are compatible with all PS3 systems in order to profit from licensing and sales. Garcia advances two claims for relief: (1) violation of the Unfair Competition Law (UCL), California Business & Professions Code § 17200, *et seq.*, and (2) violation of the Consumers Legal Remedies Act, California Civil Code § 1750, *et seq*. Defendants separately move to dismiss for failure to state a claim, Garcia opposes the motions, and defendants have jointly replied. In consideration of the

arguments raised in the parties' filings, at the hearing, and for all the reasons explained below, the motion to dismiss must be granted without leave to amend.

## II. FACTS

Garcia alleges that he purchased a PS3 in December of 2006.[1] Approximately four years later, in late 2010, he purchased Activision's Call of Duty: Black Ops videogame, which defendants allegedly represented as being PS3-compatible. According to the complaint, while Garcia was playing the videogame in January of 2011, the yellow service light on his PS3 console began to flash and the system stopped operating. The SAC, apparently adopting the parlance of video gaming enthusiasts, refers to this service indicator as the "Yellow Light of Death." Sony's website states that the activation of the service light "means that there may be an issue with an internal part within the PS3 system." SAC ¶ 42. Sony makes no further representations about the specific nature of the problem, and instead instructs consumers to send the console to Sony for repairs, which cost between $99 to $150 (plus tax). According to Garcia's theory of events, normal and intended use of Call of Duty, and certain other PS3-branded videogames, overtaxes the computational capabilities of first-generation PS3 models, such as his, prompting the graphics processor unit (GPU) to overheat and the console to fail. While plaintiff makes no averment that he heeded Sony's instructions to send in his own console for repairs, the SAC generally avers that consumers who do will receive a refurbished PS3 console from Sony that is similarly susceptible to failure when used with the same PS3-branded videogames.

The SAC goes on to assert that Sony manufactures, advertises, and sells PS3 gaming consoles to consumers, and enters into licensing agreements with Activision and other videogame developers to develop, market, and sell videogames that play on PS3 systems. These PS3-branded games play on PS3 consoles only, owing to Sony's proprietary software. Plaintiff generally maintains that Sony "is intimately involved with the design and programming of these videogames, far beyond merely providing the basic software for compatibility." *Id.* at ¶¶ 1, 22-23. According to

---

[1] Sony has allegedly released "several version of PS3 consoles," including eight distinct models released between 2006 and 2008 that are at issue in this litigation, referred to as the "fat" models in the pleadings. SAC ¶ 19. Subsequent models, referred to by plaintiff as the "slim models," do not suffer from the overheating problem alleged in his complaint. *Id.* at ¶ 20.

the SAC, Sony has publicly reported that it "support[s]" videogame developers "by expanding and reinforcing software development tools." *Id.* at ¶ 28. Plaintiff also asserts that Sony and Activision test newly developed games extensively before they receive Sony's authorization to be sold as PS3-compatible. Specifically, the SAC states that Sony provides videogame developers with PS3 units for testing, and receives prototypes of the videogame from developers for "feedback and approval" prior to release to consumers. *Id.* at ¶ 23.

Once Sony approves a videogame developed by a licensee, it is offered to consumers in packaging that features the PS3 logo, and the phrases, "PlayStation Network" and "Only On PlayStation." *Id.* at ¶ 26. The complaint also generally alleges that the packaging of PS3 consoles informs consumers that: "This model of the PlayStation®3 system is designed to play PlayStation®3 format software and has limited backward compatibility. This system is not compatible with and will not play PlayStation®2 format software. Some PlayStation® format software may play on this system." *Id.* at ¶ 24. That notice is entitled, "Compatible Software/Media," and denoted with an asterisk that directs: "See the product documentation for details." No further reference to those additional materials is made in the SAC, however, plaintiff also alleges that Sony's website states: "The PlayStation [3] supports the following disc media formats: PlayStation®3 format software with either region coding of [1] or [ALL]." *Id.* at ¶ 25.

The SAC alleges defendants knew in advance "that the technology of the PS3 videogames would surpass the capabilities of the PS3 console and that the PS3 console would not be able to handle videogames' advanced technology." *Id.* at ¶¶ 7, 36, 40. In support of this contention, the complaint states that defendants have known for many years, beginning prior to the introduction of the PS3, that the videogame industry is highly competitive and driven by demand for increasingly advanced video and audio effects, which in turn require gaming consoles with greater computational capacity. In the intervening years, consumers have posted complaints on the Internet identifying the problem, according to the SAC. Garcia generally alleges defendants have nonetheless continued to misrepresent that PS3-branded games are compatible with all PS3 consoles, in order to win sales and additional profits. The SAC states that Garcia relied on these alleged misrepresentations, and suffered a cognizable injury when his console failed. The SAC goes on to aver that he would not

have purchased his PS3 console or "Call of Duty," had he known they would not be compatible. Garcia now brings two claims for relief on behalf of a putative class of similarly-situated consumers, seeking damages and other equitable remedies.

### III. LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Pleadings are "so construed as to do substantial justice." Fed. R. Civ. P. 8(e). While "detailed factual allegations are not required," a complaint must have sufficient factual allegations to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard asks for "more than a sheer possibility that a defendant has acted unlawfully." *Id.* Put another way, the complaint must plausibly show – not merely allege – that the pleader is entitled to relief. *Id.* This determination is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Id.* at 1950.

A motion to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint. *See Parks Sch. of Bus, Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal under Rule 12(b)(6) may be based on either the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). When evaluating such a motion, the court must accept all material allegations in the complaint as true, even if doubtful, and construe them in the light most favorable to the non-moving party. *Twombly*, 550 U.S. at 570. "[C]onclusory allegations of law and unwarranted inferences," however, "are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996); *see also Twombly*, 550 U.S. at 555 ("threadbare recitals of the elements of the claim for relief, supported by mere conclusory statements," are not taken as true).

In dismissing a complaint, leave to amend must be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment. *Lucas v. Dep't of Corrections*, 66 F.3d

245, 248 (9th Cir. 1995).  When amendment would be futile, however, dismissal may be ordered with prejudice. *Dumas v. Kipp*, 90 F.3d 386, 393 (9th Cir. 1996).  When the "plaintiff has previously been granted leave to amend and has subsequently failed to add the requisite particularity to its claims, '[t]he district court's discretion to deny leave to amend is particularly broad.'" *Zucco Partners LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009) (quoting *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1097-98 (9th Cir. 2002)).

Additionally, Rule 9(b) of the Federal Rules of Civil Procedure requires that "[i]n allegations of fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Rule 9(b) applies to claims under California's UCL and CLRA that "allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis" for liability. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009).  To satisfy the rule, a plaintiff must allege the "who, what, where, when, and how" of the charged misconduct. *Cooper v. Pickett,* 137 F.3d 616, 627 (9th Cir. 1997).  In other words, "the circumstances constituting the alleged fraud must be specific enough to give defendants notice of the particular misconduct so that they can defend against the charge and not just deny that they have done anything wrong." *Vess v. Ciba–Geigy Corp. U.S.A.,* 317 F.3d 1097, 1106 (9th Cir. 2003).

IV. DISCUSSION

A. Unfair Competition Law

Garcia's first claim for relief alleges that defendants engaged in "unlawful, unfair, or fraudulent business acts or practices" under California's UCL.  Cal. Bus. & Prof. Code § 17200.  As the language of that statute suggests, a plaintiff may proceed under the UCL on three possible theories.  First, "unlawful" conduct that violates another law is independently actionable under § 17200. *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 180 (1999).  Alternatively, a plaintiff may plead that defendants' conduct is "unfair" within the meaning of the several standards developed by the courts. *Id.* at 186-87 (finding of unfairness must be "tethered to some legislatively declared policy or proof of some actual or threatened impact on competition"); *Camacho v. Auto. Club of So. Cal.*, 142 Cal. App. 4th 1394, 1403 (2006) (applying test for violations of § 5 of the Federal Trade Commission Act to evaluate unfair business acts or

practices); *McKell v. Washington Mut., Inc.*, 142 Cal. App. 4th 1457, 1473 (2006) ("business practice is unfair within the meaning of the UCL if it violates established public policy or if it is immoral, unethical, oppressive or unscrupulous and causes injury to consumers which outweighs its benefits"); *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 736 (9th Cir. 2007) (requiring, in consumer cases, "unfairness be tied to a 'legislatively declared' policy" or that the harm to consumers outweighs the utility of the challenged conduct). Finally, a plaintiff may challenge "fraudulent" conduct by showing that "members of the public are likely to be deceived" by the challenged business acts or practices. *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009); *Daugherty v. Am. Honda Motor Co., Inc.*, 144 Cal. App. 4th 824, 838 (2006) (elements of violation of UCL for "fraudulent" business practices are distinct from common law fraud). Here, the SAC purports to invoke all three theories.

Turning to this last theory first, a claim for relief from "fraudulent" conduct under the UCL is distinct from a claim for common law fraud. Unlike ordinary fraud, which requires plaintiff to plead a deception that is actually false, known to be false by the perpetrator, and reasonably relied upon by the victim, thereby incurring damages, none of these elements is required to state a claim for equitable relief under the UCL. *Tobacco II*, 46 Cal. 4th at 312 (citing *Day v. AT&T Corp.*, 63 Cal. App. 4th 325, 332 (1998)); *In re Actimmune Mktg. Litig.*, No. C 09-02376, 2009 WL 3740648, at *8 (N.D. Cal. Nov. 6, 2009). Instead, the analysis under the UCL focuses on the likely impact of defendants' alleged deceptive conduct on members of the public. *Id.* To be actionable, a "fraudulent" representation may include a false statement, or one which, though strictly accurate, nonetheless has the likely effect of misleading or deceiving the public. *McKell*, 142 Cal. 4th at 1471 (quoting *Mass. Mut. Life Ins. Co. v. Superior Court*, 97 Cal. App. 4th 1282, 1298-90 (2002)). "'Likely to deceive' implies more than a mere possibility that the advertisement might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner. Rather, the phrase indicates that the ad is such that it is probable that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 508 (2003).

No. C 11-02246 RS
ORDER

6

"A perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information," is actionable under the UCL. *Id.* Whether or not a particular statement is deceptive turns on its likely effect on a reasonable consumer. *McKell*, 142 Cal. App. 4th at 1471 (citing *Lavie*, 105 Cal. App. 4th at 507). "A reasonable consumer is the ordinary consumer acting reasonably under the circumstances, [who] is not versed in the art of inspecting and judging a product, [or] in the process of its preparation or manufacture." *Colgan v. Leatherman Tool Grp.*, 135 Cal. App. 4th 663, 682 (2006) (internal citations and quotation marks omitted).

Finally, to proceed with a putative class action for "fraudulent" conduct under the UCL, a private litigant must establish standing. Cal. Bus. & Prof. Code § 17203 ("[a]ny person may pursue representative claims or relief on behalf of others only if the claimant meets the standing requirements of Section 17204 and complies with Section 382 of the Code of Civil Procedure"). Section 17204 provides that a private individual may bring suit only if he or she has "suffered injury in fact and has lost money or property as a result of the unfair competition." The California Supreme Court has thus interpreted § 17204 to require a representative plaintiff to plead an injury in fact – e.g., the loss of money or property – and "actual reliance" on the alleged fraudulent conduct. *Tobacco II*, 46 Cal. 4th at 327. Further, where "plaintiff alleges exposure to a long-term advertising campaign, the plaintiff is not required to plead with an unrealistic degree of specificity that the plaintiff relied on particular advertisements or statements." *Id.* Although *Tobacco II* purportedly alters the pleading standard to show standing under § 17204, in federal court, it does not excuse a plaintiff prosecuting claims which "sound in fraud" from their obligation to satisfy Rule 9(b). *Kearns*, 567 F.3d at 1125; *Actimmune*, 2009 WL 3740648, at *8. Such claims must be plead with specificity.

Here, plaintiff's first amended complaint was dismissed under Rule 12(b)(6) because it claimed Sony had represented that the PS3 system was "designed to play PlayStation3 format software," but, significantly, stopped short of alleging "that this statement was false or misleading at the time [he] purchased his unit," particularly with respect to *future* games. (Order 4:17-20). In other words, Garcia neglected to identify any element of deception that concurred with his alleged

injury, and therefore failed to plead reliance. *Tobacco II*, 46 Cal. 4th at 327.  To the extent the SAC rests on Garcia's 2006 purchase of the PS3 as the alleged injury, it remains defective.  As an initial matter, it is doubtful whether Garcia has identified the alleged misrepresentations with sufficient particularity to satisfy Federal Rule of Civil Procedure 9(b).  Although the SAC generally asserts that the statements to be found on the PS3's packaging and Sony's website are misleading and exemplary of defendants' deceptive marketing campaign, *see* SAC ¶¶ 24-25, it does not specifically aver that Garcia relied on those particular statements, or even expressly state that he was aware of them.  These omissions are fatal under Rule 9(b).

More fundamentally, although the newly-amended complaint suggests Sony knew or should have known – in 2006 – that advances in video gaming technology would render the PS3 incompatible with future games years hence, the only "fact" alleged in support of that claim is that Sony was generally aware of the competitive and dynamic nature of the video game industry.  That allegation, without more, does not state a plausible claim.  Garcia simply cannot maintain an action sounding in fraud based on Sony's supposed clairvoyance as to unspecified, future technological advancements in the field.  *Cf. Morgan v. AT&T Wireless Servs., Inc.*, 177 Cal. App. 4th 1235, 1256-57 (2009) (plaintiff stated a claim because defendant knew at the time it sold cellular telephones to consumers that impending changes to the network would degrade service).  Garcia has therefore failed to state a viable claim under the UCL predicated solely on the purchase of the PS3.[2]

Garcia advances the alternative theory that Sony and Activision violated the UCL by selling him a PS3-branded copy of "Call of Duty," despite their knowledge that it was incompatible with first-generation PS3 consoles such as his.  The parties debate, as a threshold matter, whether this claim is properly understood as alleging an affirmative misrepresentation or an omission.  Defendants attempt to frame it as the latter, and on that premise, go on to argue that *Daugherty* controls because Garcia's PS3 console failed after its one-year warranty expired.  In *Daugherty*,

---

[2] Defendants also doubt the specific theory of harm advanced in the SAC – that is, they question whether there are sufficient facts pleaded to support Garcia's claim that his PS3 overheated as a result of playing "Call of Duty."  They note that Garcia allegedly played the game for several months before the service light appeared, and suggest that his four-year old PS3 was likely near the end of its useful life, and liable to fail irrespective of the game.  This issue need not be reached because the SAC is defective for other reasons.  It is at least worth noting, however, that a motion to dismiss does not permit defendants to question the weight of the evidence so long as the claim advanced is at least plausible.

plaintiff alleged Honda failed to disclose a defect that manifested itself after the expiration of the car's warranty, and argued that the purported omission was "likely to deceive" consumers "into believing that no such defect exists." 144 Cal. App. 4th at 838. The Court of Appeal determined that theory to be an end-run around the expired warranty, and concluded that plaintiff had failed to state a claim for "fraudulent" conduct under the UCL because Honda had no duty to disclose defects after expiration of the warranty. *Id*. The *Daugherty* Court explained, "[i]n order to be deceived, members of the public must have had an expectation or an assumption about" the matter in question. *Id*. (quoting *Bardin v. Daimlerchrysler Corp.*, 136 Cal. App. 4th 1255, 1275 (2006)). Although consumers cannot legitimately expect a product to function defect-free beyond the life of the warranty, manufacturers still have a duty to disclose dangerous defects, and refrain from making affirmative misrepresentations, even after the expiration of the warranty. *Id.* Because Garcia relies upon purported affirmative misrepresentations as the basis for his UCL claim, *Daugherty* does not necessarily doom his claim.

      The SAC advances the theory that the PS3 logos on the packaging of "Call of Duty," considered in conjunction with Sony's general statements concerning the console's compatibility, constitute deception. The only misrepresentations identified by the SAC on the game itself are Sony's logos – "PS3," "PlayStation Network," and "Only On PlayStation." Plaintiff evidently ascribes a great deal of significance to these phrases, as the SAC contains no other allegations about the videogame's packaging or the documentation that may have accompanied it. Given that the SAC acknowledges that the PS3 line includes numerous models released over a number of years, it is difficult to accept Garcia's allegation that the mere presence of PS3 logos on the front of the game's box, without reference to other disclosures that may have appeared on it, constitutes an affirmative misrepresentation that would deceive a reasonable consumer into believing that all such branded games must be compatible with all PS3 models in perpetuity, or at least for some unspecified number of years. Contrary to plaintiff's suggestion, the logos simply do not rise to the level of an express, affirmative representation to that effect. Garcia cannot maintain, without more, that reasonable consumers are likely to adopt his specific, and fairly extreme, understanding of the logos. *Lavie*, 105 Cal. App. 4th at 508 ("likely to deceive" means "more than a mere possibility that

the advertisement might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner").

As for Sony's undated representations regarding the PS3 console's compatibility, for the reasons discussed above, it is not clear they were false at the time when made.  Like the PS3 logos, they are also apparently only partial statements, and do not rise to the level of affirmative misrepresentations.[3]  For example, the "Compatible Software/Media" notice that allegedly appeared on the packaging of some PS3 consoles includes the specific caveat, "See the product documentation for details," yet the SAC conspicuously fails to explain what those materials entail.  Garcia cannot make out a plausible claim for an affirmative misrepresentation where it is self-evident that he has selectively omitted portions of the alleged representation attributed to defendants.

Putting that defect aside, as it could conceivably be cured by amendment of the pleadings, the SAC goes on to suggest that Sony and Activision were, as a result of their general experience in the video game industry, aware of consumer demand for increasingly advanced audio-visual effects in videogames, and knew that consumers would not expect PS3 consoles to be "rendered obsolete in a few years."  SAC ¶ 7.  The SAC apparently offers these allegations in service of the contention that consumers were deceived.[4]  *Bardin*, 136 Cal. App. 4th at 1275 ("[i]n order to be deceived, members of the public must have had an expectation or an assumption about" the matter in question); *accord Daugherty*, 144 Cal. App. 4th at 838.

There are at least two, related defects in this theory.  First, although *Daugherty* does not directly govern the analysis of Garcia's misrepresentations claims, it does teach that, absent an affirmative misrepresentation, consumers have no legitimate expectation that a product will properly function after the expiration of the warranty.  144 Cal. App. 4th at 838.  Thus, consumers may have

---

[3] As discussed above, they also have not been pleaded with the requisite particularity under Rule 9(b).  *Kearns*, 567 F.3d at 1125; *Actimmune*, 2009 WL 3740648, at *8.

[4] The SAC further suggests that PS3 owners are "locked in" to the PS3 platform by Sony because the PS3 consoles are relatively expensive, and only compatible with video games approved by Sony and specifically designed for the PS3's proprietary software platform.   Thus, new console systems are rarely introduced, and if a player's console fails, the player must buy a new PS3 to continue using his or her existing library of PS3 games.  While these allegations may enhance the plausibility of Garcia's claim marginally, defendants' alleged general profit motive provides an inadequate basis from which to draw any material inference.

an expectation of functionality beyond the warranty period only if supported by some identifiable, affirmative representation by defendants. Despite an opportunity to amend, no such averment has emerged in the SAC. Instead, plaintiff seeks to characterize incomplete or ambiguous statements as deceptive, based solely on consumer expectations that lack any independent basis. Relatedly, it is less than self-evident that consumers would expect first-generation gaming consoles to be compatible with games released years later, given the premise that the videogame industry is typified by rapid technological change. Common experience suggests the contrary: that constant innovation often leads to incompatibility and the obsolescence of older products.

In sum, Garcia does not succeed in stating a plausible claim under the UCL for "fraudulent" business acts or practices because the SAC fails to identify, with sufficient specificity to satisfy Rule 9(b), any representation by defendants that is likely to deceive a reasonable consumer. Garcia insists that whether or not defendants' statements are likely to be deceptive is usually a question of fact that requires some consideration and weighing of the evidence. *McKell*, 142 Cal. App. 4th at 1472. The issue is not triable, however, if he cannot first identify a plausible misrepresentation. *McKell*, relied upon by plaintiff on this issue, is unhelpful to him. There, the court held that defendant's "practice of charging its customers more for services than the actual cost of those services … may constitute a deceptive business practice," because "a reasonable consumer likely would believe that fees charged … bore some correlation to services rendered." *Id.* Here, by contrast, Garcia has failed to allege facts that would support a finding of likely deception, and as a result, there is simply nothing for a jury to consider.

Turning to the alternative theory of "unlawful" business acts or practices under the UCL, the SAC lists a host of independent violations of state law. Like Garcia's standalone UCL claim for "fraudulent" business practices, however, each of these statutes requires a plausible allegation of deception.[5] The absence of facts to support such an inference is thus fatal to plaintiff's suggestion

---

[5] *See* Cal. Civ. Code §§ 1572 (actual fraud, requiring "an intent to deceive"); 1573 (constructive fraud, consisting of either a breach of duty, or "any such act or omission as the law specially declares to be fraudulent"); 1709 (claim for deceit is actionable against "[o]ne who willfully deceives another…."); and 1711 (deceit to defraud the public may be alleged against "[o]ne who practices a deceit with intent to defraud the public, or a particular class of persons"). To state a claim under the California Business & Professions Code § 17500 for false advertising or the CLRA, plaintiff must plead facts to show that "members of the public are likely to be deceived." *Comm. on*

that defendants are liable for "unlawful" conduct under the UCL.  Additionally, where, as here, plaintiff's claims "sound in fraud," they must be pleaded with specificity to meet Rule 9(b)'s strictures.

Finally, the SAC's factual allegations also do not support a claim for relief from "unfair" conduct under the UCL.  Although this theory is not much developed by the parties, Garcia's pleadings track the various standards employed by the courts to suggest defendants' conduct is unfair in the sense that it offends public policy, is immoral, unethical, oppressive, unscrupulous, and injurious to consumers, and, on balance, more harmful than beneficial.  In *Lozano*, the Ninth Circuit held consumers' claims of unfairness must be "tied to a 'legislatively declared' policy." *Lozano*, 504 F.3d at 736 (citing *Scripps Clinic v. Superior Court*, 108 Cal. App. 4th 917 (2003)).  Alternatively, conduct may be deemed "unfair" if, on balance, the harm it does to consumers outweighs its utility.  *Id.*  Here, Garcia has neglected to identify any relevant legislative policy, other than those already found inapplicable, above.  While Garcia conclusorily suggests that defendants have "no legitimate business reason to advertise certain of its videogames as compatible with all PS3 consoles," again, the SAC does not adequately identify any such affirmative misrepresentations by defendants.  Accordingly, Garcia has failed to state a UCL claim under any of the three possible § 17200 theories.

Garcia's amendments to the SAC repackage certain of his legal theories, but supply no additional, material facts.  The dismissal must therefore be without leave to amend, as Garcia has now had two opportunities to amend his complaint to add sufficient factual allegations to state a claim, and has proved unable to cure the identified shortcomings.  *Lucas*, 66 F.3d at 248.

B. Consumers Legal Remedies Act

The SAC alleges defendants violated four subsections of the CLRA, which prohibits "unfair methods of competition and unfair or deceptive acts or practices" in the sale of goods or services to a consumer.  Cal. Civ. Code § 1770.  Specifically, Garcia relies on California Civil Code § 1770(a)(5), (7), (9), and (16), which proscribe both "[r]epresenting" and "[a]dvertising" goods or aspects of a transaction in a false or misleading manner.  To state a claim under the CLRA, like the

*Children's Television, Inc. v. Gen. Foods Corp.*, 35 Cal. 3d 197, 211 (1983) (§ 17500); *Consumer Advocates v. Echostar Satellite Corp.*, 113 Cal. App. 4th 1351, 1361-62 (2003) (CLRA).

UCL, plaintiff must show that defendant's conduct or advertising is "likely to deceive a 'reasonable consumer.'" *Benson v. Kwikset Corp.*, 152 Cal. App. 4th 1254, 1274-75 (2006). The "reasonable consumer" standard applied to UCL claims also applies to the CLRA. *Consumer Advocates*, 113 Cal. App. 4th at 1360. Further, pleadings under the CLRA that "sound in fraud" must be plead in compliance with Rule 9(b). *Kearns*, 567 F.3d at 1125.

To the extent plaintiff's second claim for relief relies solely on Garcia's purchase of the PS3 console, it remains unchanged, and defective for the reasons stated in the prior order.[6] As with plaintiff's UCL claim, the SAC now also asserts Garcia's purchase of "Call of Duty" as an additional factual basis for his claim. That aspect of Garcia's CLRA claim, however, is evaluated under the same standards governing his claim "fraudulent" conduct under the UCL, and for the reasons explained above, his allegations fall short of stating a cognizable claim. As a consequence, plaintiff's CLRA claim must be dismissed, once more with prejudice, as plaintiff alleges inadequate facts to support his claims, notwithstanding the opportunity to amend already afforded to him. *Lucas*, 66 F.3d at 248.

## V.  CONCLUSION

For the reasons set forth above, defendants' motions to dismiss must be granted with prejudice. The Clerk is directed to close the case.

IT IS SO ORDERED.

Dated: 5/8/12

RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE

---

[6] Specifically, the SAC fails to state a claim because the pleadings do not identify any misrepresentation contemporaneous with Garcia's purchase, or show reliance, and secondly, because plaintiff's claims are not pleaded with adequate specificity under Rule 9(b).